# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| CHARLES A. McNEIL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case number 4:10cv0233 TCM |
| ) | |
| METRO, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

This matter is before the Court[1] on the motion of defendant, Metro, to dismiss and for summary judgment on the claims of Plaintiff, Charles A. McNeil, that his employment was terminated because of his race, in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000(e) to 2000e(17); his age, in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621-634; and his disability, in violation of the American with Disabilities Act (ADA), 42 U.S.C. § 12101-12213, and the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794. Plaintiff further claims that he was intimidated, harassed, and retaliated against. Plaintiff, proceeding pro se, opposes the motion.

## Background

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

Plaintiff was terminated on December 2, 2008, from his position as bus driver for Metro. (Compl. at 6; Def. Stip.[2] ¶ 7.) The reason given was:

> [Plaintiff] failed to provide sick leave paper work to cover time off from 10/20/08 to present. [Plaintiff] was given notification via certified mail to return to work or provide the documents as to why he cannot perform his job duties. He failed to comply with instructions. [Plaintiff] was in violation of Rule 02.24 flagrant conduct,[3] which results in termination.

(Def. Stip ¶ 8.) Plaintiff alleges that the true reasons for his termination were because of his race; because of his age in that he would have become vested in the pension system in six months; and because of a disabling injury sustained at work on August 8, 2008, and aggravated when he returned too soon to work on October 20, 2008. (Compl. at 5-6.)

Plaintiff began working as a bus driver for Metro in May 1999. (Id. at 5.) On August 8, 2008, he "suffered a disabling injury" when the bus he was driving was rear-ended by a school bus. (Id.; McNeil Dep., Def. Ex. K, at 32.) On October 9, Sherwyn J. Wayne, M.D., a physician with Orthopedic & Sports Medicine, Inc., released Plaintiff to return to his

---

[2]"Stip." refers to those statements of material facts that are submitted by one party and admitted or not denied by the opposing party.

[3]Rule 02.24 reads as follows:

MetroBus Operators are required to comply with all policies and procedures of Metro, as outlined in the MetroBus Operations Rulebook, MetroBus Operator Training Manual, bulletins, directives or other such material. MetroBus Operators will not engage in any behaviors that demonstrate flagrant, willful, or repeat violation of Metro rules, regulations, and/or procedures. Repeat violation of Metro policies and procedures, regardless of the severity or the outcome, will be viewed as substandard performance and is grounds for termination.

(Def. Ex. C at 27.)

regular duty. (Def. Ex. G. at [4]; Def. Ex. K at 50.) The diagnosis was low back pain and leg pain. (Id.) Plaintiff testified in a deposition taken pursuant to his worker's compensation claim that his lower back pain was worse when he returned to driving a bus on October 20.[4] (Def. Ex. K at 44-45.) When on a return route that day, his back pain was so intense that he called Metro and told them he needed help. (Def. Ex. H at 121.) An ambulance was sent to meet him at a transfer center. (Id.) He was taken to the hospital and released that same day. (Id.) He did not return to work. (Id. at 123-24.)

On November 26, Plaintiff was sent a letter from Leslie Nations, Metro's superintendent of operations, with the following text:

> According to Metro records, you have not performed your job duties since October 20, 2008, and have not provided sick leave application paperwork. Therefore, this letter is instructing you to report to work, [sic] no later than Tuesday, December 2, 2008, or provide acceptable medical verification as to why you cannot perform your job duties.
>
> Failure to comply with the above instructions may result n termination of your employment with Metro.

(Pl. Resp. Ex. at [4].) It was Plaintiff's understanding that the letter meant he had to either provide medical documentation or return to work. (Def. Ex. H at 127.)

Plaintiff reported to work at approximately 3:30 in the morning of December 2. (Id. at 128.) He did not have any documentation with him. (Id. at 111.) The dispatcher telephoned Donna Holmes, the transit service manager, who then spoke with Plaintiff. (Id.

---

[4]Plaintiff was in computer training on October 10, the day following his release to return to work, and was then on a previously-scheduled vacation through October 19. (Def. Ex. H at 120.)

at 129.)  At a later arbitration hearing, Holmes and Plaintiff recounted the conversation differently.  Essentially, it was the position of Holmes and other testifying Metro management personnel that Plaintiff knew that he needed to report to work *with* a medical release in hand.  (Id. at 44, 48, 64-66, 84, 104, 111.)  It was Plaintiff's position that he did not know this and that he had been caught in a Catch-22 because his private physician would not treat him without a release from the workers' compensation doctor and that he was refused such a release by Metro.  (Id. at 127, 129, 151, 154.)

Holmes met later that day with Plaintiff and his union representative.[5]  (Id. at 103, 150.)  At some point, when Holmes was out of the room and on the telephone, Plaintiff left the building.  (Id. at 87-88.)  He later returned and tried to give Merlin Streate, the transit service manager then on duty, a form dated December 2, 2008, and signed by Peggy Boyd Taylor, D.O.  (Id. at 34-36, 132; Pl. Ex. 1.)  Dr. Taylor reported that Plaintiff was currently under her care and was unable to work from October 21, 2008, to January 1, 2009.  (Pl. Ex. 1.)  The diagnosis was acute lumbar sprain and a possible herniated disc.[6]  (Id.)  Streate rejected the form and informed Plaintiff that Tony LaFata, the station director, had terminated his employment.  (Def. Ex. H at 132.)

---

[5]Holmes testified at the arbitration hearing that she told the union representative that the meeting was a hearing.  Plaintiff and the representative each testified that they were not told that the meeting was to be a hearing.

[6]The diagnosis of a herniated disc was confirmed two days later by a magnetic resonance imaging (MRI) of Plaintiff's lumbar spine.  (Pl. Exs. Doc. 21.)

Plaintiff grieved his termination on the grounds that it was without cause. (Def. Ex. E.) He had been told by his union representative that LaFata did not like him, he had been told to return to work and then not allowed to when he timely reported, he had been refused workers' compensation treatment for his August 2008 injury, and he had been pressured to change his injury-related absences to sick leave. (Id.) He further alleged that LaFata did not like him because of his union activities and his race, black. (Id.)

The union took Plaintiff's grievance straight to arbitration, bypassing the preceding grievance steps. (Pl. Response Ex. at [12].) Following a hearing at which Streate, Holmes, Nations, another Metro representative, Plaintiff, and a union officer testified and the submission of the deposition of Plaintiff's union representative, the arbitrator found, in relevant part, as follows.

> I am not persuaded that Grievant [Plaintiff] legitimately believed that he was still on workers comp. He had not received workers comp payments during the month he was off. He had been released on the August 28 incident by the Agency doctor, and instructed to see his personal doctor. . . . He had been informed numerous times by Agency supervisory and management personnel that he was not on workers comp; yet he continued to insist that he was although there was no factual basis for him to believe that. . . . No matter how ardently he believed he should be on workers comp, the fact is that he was not and he had been told so by the Agency numerous times. . . .
>
> Even if his Agency superiors were mistaken about his workers comp status or if a later hearing had placed him in that status, it does not excuse his refusal to comply with Agency rules and procedures for return to work.

Concluding that Plaintiff "knew the return to work rules quite well" and "had used them several times," the arbitrator found that Plaintiff was wrong in not returning to work with the necessary medical documentation in violation of Metro's flagrant conduct rules. (Id. at 16,

18.) The arbitrator further found that the discipline imposed on Plaintiff, who had an otherwise clean disciplinary record during his nearly ten-year employment and who had been described by witnesses as a "good employee," was too harsh. (Id.) He ordered Plaintiff "reinstated in his former position in accordance with his seniority, conditioned on securing the appropriate medical releases and passing a return to work physical examination by the Agency doctors." (Id. at 19.) He was awarded no back pay and no seniority or benefit credit for the time missed. (Id.)

Plaintiff returned to work full-time for Metro as a bus driver in October 2009. (Def. Ex. at 62.) He also works for another company driving limousines on the weekends. (Id. at 62-63.)

In February 2010, Plaintiff filed the instant lawsuit. Attached to his complaint is a copy of the charge of discrimination he filed with the Missouri Commission on Human Rights. (Compl. Ex. 2.) He marked the boxes labeled "Race" and "Disability" as the basis of the discrimination. (Id.) The box labeled "Age" was not marked, nor was the box labeled "Retaliation." (Id.) In the space provided for the particulars of the charge, Plaintiff first summarized the injury-related events and Metro's refusal on October 20, 2008, to have him treated at a hospital and by Metro's physician. (Id.) He then stated that "I believe I was denied treatment and forced off employment due to my disability because other employees without disabilities were treated and allowed to return to work." (Id.) He next stated:

> On December 2, 2008 I was discharged for not following policy of submitting documentation as to why I was not going to work.

>        I believe I was discharged due to my disability because:
>        (a) I was denied treatment and
>        (b) I was not allowed to return to work
>        (c) [Metro] knew I was injured[.]
>
>    On December 3, 2008 I was appealed [sic] [Metro's] decision to discharge me. During this meeting I was told by a Union Representative that I was discharged because . . . "[Metro] did not care about me because I was black."
>
>        I believe I was discharged due to my race, black because of the
>        comments made by . . . [Metro].

(Id.) In support of his racial discrimination claim, Plaintiff states in his complaint that "On December 3, 2008 I was told by my union president that Metro termination [sic] of me was because I'm black." (Compl. at 6.)

In its pending motion, Metro argues that it is entitled to summary judgment (1) on Plaintiff's racial discrimination claim because (a) the arbitration award is preclusive and bars the claim and (b) Metro had legitimate non-discriminatory reasons to discipline Plaintiff, and (2) on his disability claim because (a) it also is barred by the arbitration award and (b) Plaintiff is not disabled as a matter of law and undisputed fact. Metro further argues that Plaintiff's claims of age discrimination, retaliation, failure to accommodate, and hostile work environment should be dismissed because he failed to exhaust the required administrative remedies.

## Discussion

<u>Summary Judgment Requests.</u>  As noted above, Metro argues that it is entitled to summary judgment on Plaintiff's claims of racial and disability discrimination.

"Summary judgment is . . . proper 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" **Torgerson v. City of Rochester**, 605 F.3d 584, 594 (8th Cir. 2010) (quoting Fed.R.Civ.P. 56(c)(2)).  "The movant 'bears the initial responsibility of informing the . . . [C]ourt of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" **Id.** (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)) (last two alterations in original).  "If the movant satisfies its burden, the nonmovant must respond by submitting evidentiary materials that 'set out specific facts showing a genuine issue for trial.'" **Id.** (quoting Fed.R.Civ.P. 56(e)(2)).  And "[i]n determining whether summary judgment is appropriate, [the] [C]ourt must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant." **Id.**  Additionally, "[w]hile employment discrimination cases are often fact intensive and dependent on nuance in the workplace, they are not immune from summary judgment, and there is no separate summary judgment standard for employment discrimination cases." **Fercello v. County of Ramsey**, 612 F.3d 1069, 1077 (8th Cir. 2010).

Citing the Supreme Court's decision in **14 Penn Plaza LLC v. Pyett**, 129 S.Ct. 1456 (2009), Metro first argues that Plaintiff's Title VII and ADA claims are both foreclosed by the arbitrator's decision in his termination grievance. The issue in that case was whether the reach of a provision in a collective bargaining agreement (CBA) extended to the plaintiffs' ADEA claims. **Id.** at 1461. The provision read:

> There shall be no discrimination against any present or future employee by reason of race, creed, color, age, disability . . . or any other characteristic protected by law, including, but not limited to, claims made pursuant to Title VII of the Civil Rights Act, the Americans with Disabilities Act, the Age Discrimination in Employment Act, . . . . All such claims shall be subject to the grievance and arbitration procedures . . . as the sole and exclusive remedy for violation. . . .[7]

**Id.** (footnote added). The Court held that this provision "that clearly and unmistakably requires union members to arbitrate ADEA claims is enforceable as a matter of federal law." **Id.** at 1474. Thus, plaintiffs were compelled to submit their employment discrimination claims to arbitration. **Id.**

Citing **14 Penn Plaza**, the district court in Minnesota held that arbitrators' findings that the plaintiff was not qualified for a sought-after position, had engaged in the charged dishonesty, and had been assigned to the same duties on the same basis as other workers were entitled to substantial deference when determining whether the plaintiff had established

---

[7]In contrast, the provision of the CBA that Metro relies on simply reads: "The Agency [Metro] and the Union shall continue to comply with all provisions of Title VI and VII of the Civil Rights Act of 1964, as amended, Executive Orders 1141, 11246, and 11375 in hiring and treatment of employees during employment without regard to their age, race, color, religion, sex, or national origin." (Def. Ex. B, § 59, at 70.)

a prima face case of national origin discrimination or of retaliation.  **Tewolde v. Owens & Minor Distr., Inc.**, 2009 WL 1653533, *5, 9-10 (D. Minn. June 10, 2009).  Metro argues that the effect of this holding is that the arbitrator's decision finding that Plaintiff was guilty of flagrant conduct as defined in Metro's rules bars his instant claims of race and disability discrimination.

The Court need not reach the question of whether Metro's argument is too presumptuous because, for the reason set forth below, Plaintiff has not rebutted Metro's showing that he was not terminated because of his race or alleged disability.

To defeat Metro's motion for summary judgment on these two claims of employment discrimination, Plaintiff "may produce direct evidence of discrimination" or, alternatively, "may avoid summary judgment by 'creating an inference of unlawful discrimination under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).'"  **Elam v. Regions Fin. Corp.**, 601 F.3d 873, 878 (8th Cir. 2010).  "[D]irect evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action."  **Torgerson**, 605 F.3d at 594 (internal quotations omitted).  Direct evidence is *not* "'stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process.'"  **Elam**, 601 F.3d at 878 (quoting Clearwater v. Indep. Sch. Dist. No. 166, 231 F.3d 1122, 1126 (8th Cir.2000)).

Drawing any inference in the light most favorable to Plaintiff, as the Court must, the Plaintiff's direct evidence is a statement by LaFata, a Metro supervisor who had decisionmaking authority, to "Metro's authorized representatives" that he did not like Plaintiff. (Def. Ex. E.) In his grievance, Plaintiff surmised that LaFata was disciplining him because of his race and union activities. In his complaint, he states that the union president told him he was being terminated by Metro because he is black.

"Rule 56(e)(1) of the Federal Rules of Civil Procedure requires affidavits to be 'made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.'" **Jenkins v. Winter**, 540 F.3d 742, 748 (8th Cir. 2008). Plaintiff's proffered direct evidence is his recitation of statements made by a union representative that LaFata did not like him and that Metro was terminating his employment because he is black. The first statement is hearsay. Hearsay, defined in Fed.R.Evid. 801(c) as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," may not be used to defeat a summary judgment motion. **Id.**; accord **Anda v. Wickes Furniture Co.**, 517 F.3d 526, 534 (8th Cir. 2008); **Cherry v. Ritenour Sch. Dist.**, 361 F.3d 474, 480 (8th Cir. 2004). Moreover, the link between LaFata not liking him and his race is one drawn by Plaintiff, presumably because of the statement made by a union representative that Metro was terminating him because of his race. This link and the underlying statements are speculation. "'While [the Court is] required to make all reasonable inferences in favor of the

nonmoving party in considering summary judgment, [the Court does] so without resort to speculation.'" **Torgerson**, 605 F.3d at 603 (quoting Twymon v. Wells Fargo & Co., 462 F.3d 925, 934 (8th Cir. 2006)). Moreover, absent any speculation, Plaintiff has, at best, LaFata's alleged statement that he does not like Plaintiff. This statement is a "[f]acially race-neutral . . . statement[ ], [which] without more, do[es] not demonstrate [discriminatory] animus on the part of the speaker.'" **Id.** (quoting Twymon, 462 F.3d at 934) (last alteration in original).

Without direct evidence of race discrimination, "[Plaintiff] can establish a prima facie case . . . by showing that (1) he is a member of a protected class; (2) he was qualified for the position (sometimes articulated as meeting the employer's legitimate expectations); (3) he suffered an adverse employment action; (4) under circumstances permitting an inference that the action was a result of unlawful discrimination." **Anderson v. Durham D & M, L.L.C.**, 606 F.3d 513, 520 (8th Cir. 2010); accord **Norman v. Union Pac. RR**, 606 F.3d 455, 461 (8th Cir. 2010).

Assuming, without deciding that Plaintiff has established a prima face case of race discrimination,[8] "the burden of production shifts to [Metro] to articulate a 'non-discriminatory, legitimate justification for its conduct, which rebuts [Plaintiff's prima facie case.'" **Elam**, 601 F.3d at 879 (quoting Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 850 (8th Cir. 2005)). "If [Metro] meets its burden, [Plaintiff] must 'produce evidence sufficient to

---

[8]By assuming that Plaintiff has established a prima facie case, the Court avoids the "tension in [the Eighth Circuit's] jurisprudence regarding whether a court may consider an employer's reasons for discharging an employee when considering the qualified element of the prima facie case." **Elam**, 601 F.3d at 880 n.4.

- 12 -

create a genuine issue of material fact regarding whether [Metro's] proffered nondiscriminatory reason is a pretext for discrimination.'" **Id.** (quoting Rodgers, 417 F.3d at 853). Plaintiff "has the burden of persuasion at all times." **Rodgers**, 417 F.3d at 850.

Metro has introduced evidence that it terminated Plaintiff for failing to have the appropriate medical documentation when he returned to work, having been made aware that such documentation was required. Plaintiff disputes that he knew of the documentation requirement. The question before the Court, however, is not whether Plaintiff knew he had to bring the documentation with him when returning to work, but is whether Metro's supervisors honestly believed that he did. See **Fercello**, 612 F.3d at 1082; **Dixon v. Pulaski County Special Sch. Dist.**, 578 F.3d 862, 869 (8th Cir. 2009). Moreover, "'[a] reason cannot be proved to be a "pretext for *discrimination*" unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" **Id.** at 872 (quoting Floyd v. State of Mo. Dept. of Soc. Servs., Div. of Family Servs., 188 F.3d 932, 937 (8th Cir. 1999)) Plaintiff has not shown that Metro's reason for his termination was false *or* that discrimination was the real reason. Plaintiff's belief, based on the alleged statements by the union representatives, that his race was the reason for his termination is insufficient to create a jury question as to pretext. See **Anderson**, 606 F.3d at 522. See also **McCullough v. Univ. of Ark. for Medical Sciences**, 559 F.3d 855, 862 (8th Cir. 2009) (affirming summary judgment in employment discrimination case in which plaintiff had argued that the decision to terminate him must have been based on discrimination because the proffered reason was

"irrational"; the record in support of the challenged decision was not so sparse and the employer's conclusion was not so implausible as to create a genuine issue as to whether the employer's motivation was impermissible).

Plaintiff further claims that he was terminated because of a disability, in violation of the ADA. Because he does not allege any direct evidence of such discrimination, he must make a prima facie showing under the McDonnell Douglas burden-shifting framework. See **Willnerd v. First Nat. Neb., Inc.**, 558 F.3d 770, 777 (8th Cir. 2009). This showing requires Plaintiff to demonstrate that he: "'was disabled within the meaning of the ADA;' (2) 'was qualified to perform the essential functions of [his] job;' and (3) suffered an adverse employment action because of [his] disability.'" **Wisbey v. City of Lincoln, Neb.**, 612 F.3d 667, 672 (8th Cir. 2010) (quoting Kosmicki v. Burlington N. & Santa Fe Ry., 545 F.3d 649, 651 (8th Cir. 2008)); accord **Norman**, 606 F.3d at 459. Plaintiff has failed to create a genuine issue as to the first element.

"The ADA defines a disability, with respect to an individual, as: '(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.'" **Id.** (quoting 42 U.S.C. § 12102(2)). "A 'major life activity' means 'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" **Id.** at (quoting 29 C.F.R. § 1630.2(i)). Additionally, "the

impairment must be of an extended or permanent duration . . . ." **Gretillat v. Care Initiatives**, 481 F.3d 649, 653 (8th Cir. 2007). "[T]emporary impairments with little or no long-term impact are not disabilities." **Samuels v. Kansas City Mo. Sch. Dist.**, 437 F.3d 797, 802 (8th Cir. 2006) (citing 29 C.F.R. § 1630.2(j)(2)(ii)-(iii)).

The only activity that Plaintiff alleges was affected by his back impairment was his driving a bus. He returned to work four months after his initial injury and six weeks after his reinjury. He had his physician's statement on December 2, 2008, that he could return to work as of January 2, 2009. At the time of a hearing on his worker's compensation claim, he was driving a bus and driving a limousine. His impairment does not meet the ADA definition's of a disability.[9] See **Samuels**, 437 F.3d at 802 (finding no genuine issue as to whether plaintiff had disability within meaning of ADA – record established that none of plaintiff's physical limitations would last longer than six months); **Taylor v. Nimock's Oil Co.**, 214 F.3d 957, 960-61 (8th Cir. 2000) (finding that plaintiff who had had heart attack was not disabled within the meaning of the ADA when restrictions had lasted only four months).

---

[9]Insofar as Plaintiff's ADA claim may be construed to be a claim that Metro's requirement of medical documentation is a violation of the ADA, such a claim would be unavailing, see **Wenzel v. Missouri-Am. Water Co.**, 404 F.3d 1038, 1043 (8th Cir. 2005), as would a claim that forcing Plaintiff to use sick leave or leave under the Family Medical Leave Act when he was not at work between October 2, 2008, and December 2, 2008, violated the ADA, see **Anderson v. North Dak. State Hosp.**, 232 F.3d 634, 637 (8th Cir. 2000). Additionally, any claim that he was "regarded as having a [disabling] impairment," 42 U.S.C. § 12102(2), would clearly be unavailing given Metro's insistence – over Plaintiff's vigorous objections – that he had not sustained a serious injury.

The fatal flaw in Plaintiff's ADA claim also defeats his Rehabilitation Act claim. See **Wojewski v. Rapid City Regional Hosp., Inc.**, 450 F.3d 338, 344 (8th Cir. 2006) (cases interpreting either ADA or Rehabilitation Act are applicable and interchangeable).

Dismissal Requests. Metro also argues that Plaintiff's claims of age discrimination, retaliation, failure to accommodate, and hostile work environment must be dismissed for failure to exhaust administrative remedies.

Exhaustion of administrative remedies is a condition precedent to the filing of an action under the ADEA," **Anderson v. Durham D & M, LLC**, 606 F.3d 513, 523 (8th Cir. 2010), to a claim of retaliation, see **Stuart v. General Motors Corp.**, 217 F.3d 621, 630 (8th Cir. 2000), of harassment, see **Kells v. Sinclair Buick-GMC Truck, Inc.**, 210 F.3d 827, 836 (8th Cir. 2000), or of failure to accommodate under the ADA, see **id.** To satisfy this exhaustion requirement, "[t]he information given in a[] . . . charge [of discrimination] must be sufficient to give the employer notice of the subject matter of the charge and identify generally the basis for a claim, but it need not specifically articulate the precise claim or set forth all the evidence an employee may choose to later present in court." **Wallace v. DTG Operations, Inc.**, 442 F.3d 1112, 1123 (8th Cir. 2006). There is, however, a difference between "'liberally reading a claim which lacks specificity, and inventing, ex nihilo, a claim which simply was not made.'" **Cottrill v. MFA, Inc.**, 443 F.3d 629, 634 (8th Cir. 2006) (quoting Parisi v. Boeing Co., 400 F.3d 583, 585 (8th Cir. 2005)).

Plaintiff's charge of discrimination referred to the discrete acts of Metro refusing to authorize treatment for him after pain forced him to stop work on October 20, 2008; of not allowing him to return to work after refusing to authorize treatment; and of discharging him. These acts were attributed by Plaintiff to his disability and his race. Nothing in the charge suggests that Plaintiff was also alleging that Metro had retaliated against him – indeed, there is no allegation of him engaging in any protected conduct – or had failed to accommodate him – there is no allegation that he had requested, or needed, any accommodation – or had subjected him to a hostile environment. See **Fair v. Norris**, 480 F.3d 865, 867 n.2 (8th Cir. 2007) (dismissing claim of sexual harassment on grounds that plaintiff had not exhausted administrative remedies "[g]iven lack of any apparent relationship between [plaintiff's] allegations of sexual harassment . . . and the basis of her complaint [of racial discrimination] to the EEOC"); **Bainbridge v. Loffredo Gardens, Inc.**, 378 F.3d 756, 760 (8th Cir. 2004) (finding that plaintiff had failed to exhaust his Title VII administrative remedies on his retaliation claim when he had not checked the box next to "Retaliation" on the charge form and did not allege any facts connecting his termination with his current allegations about racial slurs); **Russell v. TG Mo. Corp.**, 340 F.3d 735, 747-48 (8th Cir. 2003) (plaintiff who had checked the box for, and had alleged a claim, of disability discrimination could not rely on that claim to show that she had exhausted administrative remedies on her retaliation claim, nor did statement in support of discrimination claim provide sufficient notice of retaliation claim); **Kells**, 210 F.3d at 836 (finding verbal harassment claim was not

reasonably related to claims of discriminatory demotion and termination for purposes of exhaustion of administrative remedies).

### **Conclusion**

Plaintiff has failed to create a genuine issue of material fact as to whether he was terminated because of his race or a disability. He has also failed to exhaust his administrative remedies as to his other employment-related claims. Accordingly,

**IT IS HEREBY ORDERED** that the motion of Metro to dismiss and for summary judgment is **GRANTED**. [Doc. 14] The claims of Charles A. McNeil of race and disability discrimination are dismissed and the remaining claims are dismissed without prejudice.

**IT IS FURTHER ORDERED** that all other pending motions are **DENIED** as moot.

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  25th  day of October, 2010.